## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHARLES C. MCCOY,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00026 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Charles C. McCoy, ("McCoy"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,*

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows McCoy protectively filed applications for DIB and SSI[2] on November 26, 2018, alleging disability as of August 22, 2017, due to problems

---

[2] McCoy previously filed applications for DIB and SSI on May 20, 2013, alleging disability as of January 31, 2012. (R. at 64.) By decision dated August 21, 2017, the ALJ denied his claims. (R. at 64-82.) After the ALJ issued his decision, McCoy pursued his administrative appeals, but the Appeals Council denied his request for review. McCoy then filed an action in this court seeking review of the ALJ's unfavorable decision. *See McCoy v. Saul*, Case No. 2:18cv00046. By order dated December 9, 2019, this court granted summary judgment and affirmed the final decision of the Commissioner denying benefits.

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01 at *36960, 1991 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. §§ 404.1520c, 416.920c, which prescribe how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous August 2017 decision and found it to be unpersuasive. (R. at 31.) The ALJ noted the record did not support the limitations regarding shoulder or cervical symptoms; thus, no overhead reaching limitation was needed. (R. at 31.) The ALJ further noted the current record did not indicate significant migraines. (R. at 31.) In addition, the ALJ noted the previous decision was done before the record indicated worsening abdominal issues, which could worsen, especially with worsening liver function. (R. at 31.)

with his hand, back, neck, hip and right knee; migraines; anxiety; depression; and a hiatal hernia. (Record, ("R."), at 21, 218-19, 222-24, 258, 267, 274.) The claims were denied initially and on reconsideration. (R. at 139-41, 145-54, 156-58, 161-75.) McCoy requested a hearing before an administrative law judge, ("ALJ"). (R. at 176-77.) A hearing was held on October 13, 2020, at which McCoy was represented by counsel. (R. at 39-60.)

By decision dated November 6, 2020, the ALJ denied McCoy's claims. (R. at 21-33.) The ALJ found McCoy met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2018. (R. at 23.) The ALJ found McCoy had not engaged in substantial gainful activity since August 22, 2017, the alleged onset date. (R. at 23.) The ALJ determined McCoy had severe impairments, namely lumbar and thoracic degenerative disc disease, liver cirrhosis and H. pylori gastritis, but he found McCoy did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23, 26.)

The ALJ found McCoy had the residual functional capacity to perform sedentary[3] work, except he was limited to no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; no more than occasional exposure to hazards, such as hazardous machinery or unprotected heights; no more than occasional work in extreme cold or around vibrations; and he would be off-

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a) (2021).

task five percent of the workday and be absent from work one day a month. (R. at 26-27.) The ALJ found McCoy was unable to perform his past relevant work. (R. at 31.) Based on McCoy's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that McCoy could perform, including the jobs of an addressing clerk, a weight tester and a lens inserter. (R. at 31-32, 55-56.) Thus, the ALJ concluded McCoy was not under a disability as defined by the Act, from August 22, 2017, through the date of the decision, and he was not eligible for SSI and DIB benefits. (R. at 33.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2021).

After the ALJ issued his decision, McCoy pursued his administrative appeals, (R. at 213-14, 296-97), but the Appeals Council denied his request for review. (R. at 1-5.) McCoy then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2021). This case is before this court on McCoy's motion for summary judgment filed December 13, 2021, and the Commissioner's motion for summary judgment filed January 12, 2022.

## II. Facts[4]

McCoy was born in 1978, (R. at 31), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). McCoy obtained his general

---

[4] McCoy's only dispute is with respect to the ALJ's assessment of his physical limitations. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Therefore, the court will address the facts relevant to McCoy's physical health.

education diploma, ("GED"), and he has past relevant work as a roof bolter, a bridgeman, a heavy equipment operator and shipping/receiving worker. (R. at 259.) McCoy testified he could not perform bilateral overhead reaching. (R. at 51.) He stated he experienced numbness and tingling in his right shoulder. (R. at 51.) McCoy stated that, if he were to hold onto objects in his hands out in front of him at chest or tabletop level for more than five minutes, he would lose grip. (R. at 51.) He stated he received treatment for possible hepatitis and liver failure. (R. at 52-53.) McCoy stated he was told he had two months to maybe one year to live. (R. at 53.) When asked if he used alcohol or unprescribed medication, McCoy stated, "[i]f I did, I would die instantly." (R. at 54.)

In rendering his decision, the ALJ reviewed records from Dr. William Rutherford, Jr., M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician; Coeburn Hospital Clinic; Dr. Tihomir Tochev, M.D.; William A. Davis Clinic; Norton Community Hospital; University of Virginia Health System, ("UVA"); Haysi Clinic; Johnston Memorial Hospital; Dr. Gurcharan S. Kanwal, M.D.; Holston Valley Medical Center, ("Holston Valley"); and Duke Health.

By way of background, in June 2006, McCoy fractured his left hand while working in a coal mine and underwent an open reduction internal fixation on the left hand for treatment of traumatic fractures of the left second and third metacarpals. (R. at 311-13.) Subsequent x-rays of McCoy's left hand revealed that his factures had healed well. (R. at 321.) In March 2007, an electromyography, ("EMG"), and nerve conduction study revealed normal results. (R. at 468.) On August 17, 2007, McCoy fractured his right hand and underwent surgery. (R. at 323-26.) On September 11, 2007, x-rays of McCoy's right hand showed no

complications. (R. at 450.) On October 8, 2008, a nerve conduction study was normal with no evidence of peripheral neuropathy in McCoy's left upper extremity. (R. at 337-38.) In April 2012, McCoy was admitted to Norton Community Hospital for pyelonephritis; ureterolithiasis; leukocytosis; elevated creatinine; and acute renal failure. (R. at 367-68.)

On August 27, 2014, McCoy began treating with Dr. Tihomir Tochev, M.D., for complaints of back and neck pain, shooting pain in his shoulder and numbness in his arm. (R. at 407.) On November 19, 2014, McCoy reported that he could not turn his neck to the right. (R. at 405.) He acknowledged taking Suboxone[5] to deal with the pain. (R. at 405.) Dr. Tochev diagnosed cervicalgia. (R. at 405.) In June 2015, McCoy complained of hip and knee pain. (R. at 403.) On October 18, 2015, at his routine follow-up appointment, McCoy had no new complaints or concerns. (R. at 402.)

On January 15, 2015, Dr. Tochev completed a medical assessment, indicating McCoy could lift and carry items weighing five pounds;[6] stand and/or walk up to 30 minutes without interruption; sit up to 30 minutes both in an eight-hour workday and without interruption; occasionally climb, stoop, kneel, balance, crouch and crawl; he had a limited ability to reach, handle, push and pull; and he was restricted from working around heights, moving machinery, temperature extremes, noise, humidity and vibration. (R. at 394-96.) Dr. Tochev opined McCoy would be absent from work more than two days a month. (R. at 396.)

_____

[5] McCoy stated he obtained Suboxone from his brother. (R. at 405.)

[6] Dr. Tochev based this restriction on advanced degenerative disc disease of the cervical and lumbar spine and chronic rotator cuff syndrome. (R. at 394.)

On March 17, 2015, McCoy presented to Dr. Tochev for a checkup and medication refills, reporting no new complaints. (R. at 404.) A physical examination was essentially unremarkable, with no findings being documented regarding McCoy's neck, shoulders, back, hips, hands or knees. (R. at 404.)

On December 10, 2015, Dr. Tochev completed a medical assessment, indicating McCoy could occasionally lift and carry items weighing five pounds and frequently lift and carry items weighing three pounds;[7] stand and/or walk both a total of one hour in an eight-hour workday and without interruption; sit both a total of one hour in an eight-hour workday and without interruption; occasionally climb, stoop, kneel and balance and never crouch and crawl; he had a limited ability to reach, to handle and to push and pull; and he was restricted from working around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 409-11.) Dr. Tochev opined McCoy would be absent from work more than two days a month. (R. at 411.) Dr. Tochev opined McCoy was unable to engage in full-time employment and was permanently disabled from his previous occupation as a coal miner. (R. at 413.)

On June 16, 2015, McCoy complained of hip and knee pain. (R. at 403.) A physical examination showed no new findings. (R. at 403.) At his follow-up appointments with Dr. Tochev in August and October 2015, no new complaints or concerns were documented, and McCoy remained "self-employed." (R. at 398, 402.)

---

[7] Dr. Tochev based these limitations on a right shoulder rotator cuff injury and advanced degenerative disc disease of the cervical and lumbar spine with radiculopathy. (R. at 409.)

On January 7, 2016, x-rays of McCoy's right shoulder showed no evidence of acute osseous abnormality. (R. at 399.) On June 16, 2016, McCoy indicated his pain medication relieved 60 percent of his pain, which Dr. Tochev determined was "clinically significant." (R. at 400.)

On March 7, 2017, McCoy saw Dr. Gurcharan S. Kanwal, M.D., for complaints of back, neck, feet and left leg pain. (R. at 416-19.) McCoy reported consuming alcoholic beverages on a nightly basis to relieve his pain. (R. at 416.) Dr. Kanwal diagnosed chronic low back and left leg pain, chronic obstructive pulmonary disease, ("COPD"), and neck and shoulder pain and recommended McCoy stop consuming alcohol. (R. at 419.) On April 5, 2017, McCoy complained of chronic, persistent pain in the low back, bilateral hip, right shoulder and neck pain. (R. at 415.) Physical examination showed "multi-site tenderness." (R. at 415.) Dr. Kanwal prescribed medication to treat McCoy's back, hip, neck and right shoulder pain and education was given for Narcan nasal spray. (R. at 415.)

On February 22, 2018, McCoy saw Anita Renee D. Coe, N.P.-C., a certified nurse practitioner at the William A. Davis Clinic, for complaints of abdominal pain and cramps, which began two months prior and were intermittent since onset. (R. at 453.) McCoy was in no acute distress; his breathing was effortless and normal; he had clear breath sounds, bilaterally; and his abdomen was soft, non-tender with no masses. (R. at 456.) Coe diagnosed unspecified abdominal pain. (R. at 456.) On May 1, 2018, McCoy complained of vomiting and diarrhea. (R. at 461.) McCoy was encouraged to find something to do to earn money, as there was no reason that he should not be working. (R. at 461.) His examination findings were normal, and he was encouraged to perform physical activity and to increase such as tolerated. (R. at 463, 465.)

On June 5, 2018, McCoy saw Coe and reported back and hand pain. (R. at 479.) He stated, "I feel like my shoulders are out of place all the time. I hurt everywhere." (R. at 479.) McCoy reported his hypertension and indigestion were helped with medication. (R. at 479.) McCoy was in no acute distress; his breathing was effortless and normal; he had clear breath sounds, bilaterally; and he had a normal gait. (R. at 481.) Coe diagnosed nicotine dependence, unspecified; screening for other digestive system disorders; hypertension; and low back pain. (R. at 481-82.)

On July 6, 2018, McCoy presented to the emergency department at Johnston Memorial Hospital for complaints of abdominal pain, nausea and vomiting, which he stated began three months prior. (R. at 436-50.) Upon examination, McCoy was in no acute distress; his abdomen was normal, with normal bowel sounds; and his extremities were all grossly normal. (R. at 437.) An ultrasound of McCoy's abdomen was unremarkable. (R. at 435.) McCoy's lab results showed his creatinine level was 1.21, his bilirubin level was 2.0 and his albumin level was 4.7. (R. at 445.) He was diagnosed with generalized abdominal pain, nausea and vomiting and released from work for two days. (R. at 440, 450.)

On July 9, 2018, McCoy saw Coe and reported thoracic and low back pain and numbness in his lower extremities. (R. at 491.) He stated repetitive movement made his pain worse. (R. at 491.) He denied respiratory and gastrointestinal problems. (R. at 493.) McCoy was in no acute distress; his breathing was effortless and normal; he had clear breath sounds, bilaterally; his abdomen was soft, non-tender with no masses; he had a normal gait; his thoracic and lumbar spine was stable with no tenderness and normal range of motion; and his bilateral lower extremities had no joint instability, normal range of motion and normal palpation.

(R. at 493-94.) Coe diagnosed unspecified abdominal pain, low back pain and radiculopathy, thoracic region. (R. at 494.) Coe ordered an MRI of the thoracic spine and referred McCoy to gastroenterology. (R. at 495-96.) On August 2, 2018, an MRI of McCoy's thoracic spine showed mild exaggerated kyphosis of the thoracolumbar junction with small disc osteophyte complexes at the T11-T12 and T12-L1 levels, without significant spinal canal or foraminal stenosis. (R. at 577.)

On September 19, 2018, McCoy saw Coe and reported nausea and vomiting. (R. at 497.) He requested an MRI of his lumbar spine because he could not lie flat on his back without experiencing cramping and numbness. (R. at 497.) McCoy was in no acute distress; his thyroid gland was normal; his breathing was effortless and normal; he had clear breath sounds, bilaterally; his abdomen was soft, non-tender with no masses; and his gait was normal. (R. at 499-500.) Coe ordered an MRI of McCoy's lumbar spine[8] and discussed him returning to work if the MRI was normal. (R. at 501.)

On December 4, 2018, McCoy was seen at UVA for dyspepsia and gastroesophageal reflux disease, ("GERD"). (R. at 589.) He reported medication did not help his symptoms.[9] (R. at 589.) McCoy was in no distress; his pulmonary examination showed he had decreased breath sounds throughout; his abdomen was nondistended, nontender with no rebound or guarding; and his extremities were normal without clubbing, cyanosis or edema. (R. at 590.) Due to his persistent symptoms and heavy use of tobacco and alcohol history, an endoscopy was

---

[8] On December 3, 2018, an MRI of McCoy's lumbar spine showed mild congenital bony spinal canal stenosis with mild to moderate degenerative changes resulting in mild bilateral neural foraminal stenosis at the L4-L5 and L5-S1 levels. (R. at 575-76.)

[9] It was noted McCoy was taking his medication at an inappropriate time, which was likely the underlying cause behind its inability to control his symptoms. (R. at 591.)

ordered. (R. at 591.) On January 8, 2019, McCoy an endoscopy showed a hiatal hernia and erythematous mucosa in the stomach. (R. at 582-85.) Biopsies obtained from the endoscopy showed H. pylori and gastritis. (R. at 594.)

On April 12, 2019, McCoy established care with Dr. Melissa Keene, M.D., a physician with Haysi Clinic. (R. at 612.) McCoy reported back, right shoulder and bilateral hand pain. (R. at 612.) McCoy was in no acute distress; his breathing was effortless and normal; he had clear breath sounds, bilaterally; his abdomen was soft, non-tender with no masses; he had a normal gait; he had arthritic changes to the digits; his cervical, thoracic and lumbar spine was stable without tenderness and normal range of motion; and his motor examination revealed normal tone, bulk and strength. (R. at 615.) Dr. Keen diagnosed nicotine dependence, unspecified; hypertension; and spinal stenosis, lumbosacral region. (R. at 615-16.)

On July 15, 2019, Dr. William Rutherford, Jr., M.D., a state agency physician, stated that, due to McCoy's failure to provide the additional evidence requested, his determination was based on the evidence contained in the file, which showed he was not disabled. (R. at 97.) His claim was ultimately processed as insufficient evidence due to failure to cooperate. (R. at 105.) On November 19, 2019, Dr. Bert Spetzler, M.D., a state agency physician, also found there was insufficient evidence available to assess the severity of McCoy's impairments due to McCoy's failure to respond. (R. at 119.)

On May 10, 2020, McCoy presented to the emergency department at Norton Community Hospital for complaints of left lower extremity swelling and increased back pain. (R. at 713.) It was noted that McCoy "drinks heavily," with his last alcohol consumption occurring a few hours earlier. (R. at 713.) An ultrasound of

McCoy's left lower extremity showed no evidence of deep vein thrombosis and a Baker's cyst[10] within the popliteal fossa. (R. at 706.)

On September 13, 2020, McCoy presented to the emergency department at Norton Community Hospital for right upper quadrant abdominal pain, nausea and vomiting. (R. at 671-72, 702-03.) McCoy stated he consumed six shots of vodka daily. (R. at 672.) He symptomatically improved with pain management and hydration. (R. at 672.) Smoking and alcohol cessation was advised. (R. at 672.) A CT scan of McCoy's abdomen and pelvis showed gallstones and gallbladder sludge, hepatic steatosis and enlarged liver and spleen. (R. at 687.) McCoy's lab results showed his creatinine level was 1.26, his bilirubin level was 4.4 and his albumin level was 2.9. (R. at 684.) He was diagnosed with alcoholic gastritis without bleeding; right upper quadrant pain; opioid dependence, uncomplicated; esophageal varices without bleeding; acute kidney failure, unspecified; hypertension; GERD without esophagitis; diaphragmatic hernia without obstruction or gangrene; chronic pain; and back pain, unspecified. (R. at 662.)

On September 24, 2020, McCoy was admitted to Norton Community Hospital for intractable nausea and vomiting. (R. at 631, 668-69.) McCoy's history included alcohol abuse, alcoholic gastritis and hepatitis C. (R. at 631.) McCoy stated he consumed six shots of liquor per day, smoked a half a pack of cigarettes a day, had a history of illicit intravenous drug use and was using Suboxone, which he bought off the street. (R. at 633, 736.) McCoy appeared ill; his lungs were clear to auscultation, bilaterally with no wheezes, rhonchi or rales; his liver was

---

[10] A Baker's cyst is a fluid filled cyst that causes a bulge and a feeling of tightness behind the knee. *See* https://www.mayoclinic.org/diseases-conditions/bakers-cyst/symptoms-causes/syc-20369950 (last visited Aug. 17, 2022).

distended two inches below costal margin; he had pain to palpation in the right upper and middle quadrant; he had no edema in his upper or lower extremities; and he had spontaneous movement of his bilateral extremities against gravity. (R. at 634-35.) A CT scan of McCoy's abdomen showed colitis involving the right colon; small amount of free fluid adjacent to the liver and right paracolic gutter in the dependent pelvis; fatty liver; distended gallbladder containing sludge and stones; trace right pleural effusion and adjacent atelectasis; and a hiatal hernia. (R. at 656.) A CT scan of McCoy's chest showed trace bilateral pleural effusions, nonspecific, and hepatic steatosis. (R. at 658-59.) McCoy's lab results showed his creatinine level was 1.70, his bilirubin level was 3.6, his albumin level was 3.1 and his international normalized ratio, ("INR"),[11] was 1.7. (R. at 644-45.) McCoy declined to see a general surgeon and requested transfer to another facility. (R. at 631-32.)

On September 25, 2020, McCoy was discharged and transferred to Holston Valley with an admission diagnosis of alcoholic hepatitis. (R. at 630, 729, 732.) The following day, a CT scan of McCoy's head showed mild global parenchymal volume loss, advanced for his age, and minimal periventricular white matter disease, likely representing chronic small vessel ischemic changes, advanced for his age. (R. at 770-71.) Chest x-rays showed mild bibasilar opacities and mild right midlung opacity, which appeared to be new and increased since the CT scan of September 25 and possibly represented atelectasis or infiltrates. (R. at 774.) An ultrasound of McCoy's gallbladder showed ascites around the liver, presumably related to colitis of the right colon; the gallbladder was distended with gallstones and sludge; and marked fatty infiltration of the liver. (R. at 773.) McCoy's lab

---

[11]    An INR test measures the time for the blood to clot. *See* https://www.healthdirect.gov.au/international-normalised-ratio-INR-test (last visited Aug. 17, 2022).

results showed his creatinine level was 0.65, his bilirubin level was 7.0 and his albumin level was 2.8. (R. at 744.)

On September 30, 2020, a hepatobiliary scan showed evidence of medical hepatic disease, although it was noted these findings could be consistent with significant gallbladder dysfunction, possible severe acute cholecystitis or partial cystic duct obstruction, and there was no evidence of acute cholecystitis. (R. at 739.) A CT scan of McCoy's abdomen and pelvis showed paddock steatosis with probable underlying cirrhosis; splenomegaly; small volume ascites, progress from September 24; gallbladder distention with numerous small gallstones and sludge; colonic wall thickening; worsening small volume pleural effusion; and small gastric hernia. (R. at 769-70.) Lab results showed McCoy's creatinine level was 0.50, his bilirubin level was 5.0, his albumin level was 2.6 and his INR was 1.8. (R. at 758-60.)

On October 3, 2020, McCoy was discharged from Holston Valley and diagnosed with alcoholic hepatitis in the setting of liver cirrhosis; acute hypoxic respiratory failure, resolved; right middle and upper lobe and pneumonia; alcohol withdrawal with delirium; colitis; gallbladder sludge and stones; elevated liver function tests; elevated bilirubin; folate deficiency; thrombocytopenia; and anemia, likely due to alcoholism. (R. at 732.) McCoy's lab results showed his creatinine level was 0.47, his bilirubin level was 5.2 and his albumin level was 3.1. (R. at 768.) McCoy was advised he had a greater than 50 percent mortality in the next two years and at least a five percent mortality in the next three months if he continued to consume alcohol. (R. at 739.) It was noted that, if McCoy ceased consuming alcohol, he could have enough residual liver function to survive. (R. at

739.) McCoy was advised to cease all alcohol, opioid and benzodiazepine use. (R. at 735, 739.)

On December 9, 2020, was seen by Judith Gentile, M.S.N., A.N.P., an adult nurse practitioner with Duke Health, for evaluation of cirrhosis. (R. at 12.) McCoy had minimal jaundice; he was not anemic; his lungs were clear to auscultation posteriorly; his breathing was unlabored; his abdomen was soft with mild tenderness in the right upper quadrant; he had no clinical evidence of ascites; his liver was palpable below the right costal margin; his spleen was not palpable; he had normal bowel sounds; he had no pedal edema; he was alert and oriented with no asterixis; he had normal mental status examination; and his skin had no obvious rashes or lesions. (R. at 14.) McCoy reported, since being discharged, he had remained abstinent from alcohol, with exception of a one-day relapse three weeks earlier. (R. at 12, 16.) Because he mostly remained abstinent from alcohol, his jaundice significantly improved, and edema resolved. (R. at 16.)

Gentile reported McCoy's lab results were much improved with improvement in bilirubin and INR. (R. at 16.) McCoy's model for end-stage liver disease, ("MELD"),[12] score improved to 15. (R. at 16.) McCoy's lab results showed his creatinine level was 0.9, his bilirubin level was 2.8, his albumin level was 3.3 and his INR was 1.5. (R. at 15-16.) Gentile noted liver transplantation could not be considered until six-month abstinence from alcohol, and McCoy's liver may have significant recovery over the course of this time. (R. at 16.) That

---

[12] The MELD is a disease severity scoring system for adults with liver disease designed to improve the organ allocation in transplantation based on the severity of liver disease rather than the length of time on the waiting list. The MELD score is based on laboratory data, which uses a patient's creatinine, bilirubin and INR. *See* https://www.medicinenet.com/meld/definition.htm (last visited Aug. 17, 2022).

same day, Dr. Maria Cristina Segovia, M.D., noted McCoy's long-standing history of alcohol consumption complicated with liver disease. (R. at 16.) She reported that, although McCoy was "quite sick" during a recent admission, he seemed to be recovering "nicely" the longer he remained abstinent from alcohol. (R. at 16-17.)

### III.   Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

McCoy argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinion of Dr. Tochev. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief") at 4-5.) McCoy argues that substantial evidence does not exist in the record to support the ALJ's finding that the severity of his cirrhosis, and the possibility of its resulting limitations, did not meet or equal the listed impairment for chronic liver disease found at Part 404, Subpart P, Appendix 1, § 5.05. (Plaintiff's Brief at 5.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[13]

---

[13] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2021).[14] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and

---

psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2021).

[14] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

nonmedical sources in the claim, the more persuasive the medical opinion(s) …
will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical
opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2),
416.920c(b)(2). After considering the relevant factors, the ALJ is not required to
explain how he considered each of them. Instead, when articulating his finding
about whether an opinion is persuasive, the ALJ need only explain how he
considered "the most important factors" of supportability and consistency. *See* 20
C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other
factors, including the source's relationship with the claimant, but generally has no
obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3)
(2021).

When the ALJ finds two or more opinions or findings about the same issue
are both equally well-supported and consistent with the record, but are not exactly
the same, the ALJ must consider the most persuasive factors, including the nature
and extent of the medical source's relationship with the claimant and area of
specialization, as well as the catch-all "other factors that tend to support or
contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§
404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can
still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2021).
The ALJ found McCoy had the residual functional capacity to perform sedentary
work, except he was limited to no more than occasional climbing, balancing,
stooping, kneeling, crouching and crawling; no more than occasional exposure to

hazards, such as hazardous machinery or unprotected heights; no more than occasional work in extreme cold or around vibrations; and he would be off-task five percent of the workday and be absent one day a month. (R. at 26-27.) The ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c) (2021); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2021) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner).

McCoy argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinion of Dr. Tochev. (Plaintiff's Brief at 4-5.) In making his residual functional capacity finding, the ALJ stated he found Dr. Tochev's January and December 2015 assessments[15] "unpersuasive" because the evidence did not indicate such great physical limitations. (R. at 30-31.) The record shows that, in May 2018, nurse practitioner Coe encouraged McCoy to find something to do to earn money, as there was no reason that he should not be working. McCoy's examination findings were normal, and he was encouraged to perform physical activity and to increase such as tolerated. In August 2018, an MRI of McCoy's thoracic spine showed mild kyphosis with small disc osteophyte complexes without significant spinal canal or foraminal stenosis. In December 2018 an MRI of McCoy's lumbar spine showed mild congenital bony spinal canal stenosis with mild to moderate degenerative changes resulting in mild bilateral neural foraminal stenosis. Records from UVA and Dr. Keene show McCoy's

---

[15] The court notes that these assessments were offered and considered in the previously adjudicated period and were given little weight in the ALJ's August 2017 decision. (R. at 79.) In addition, upon appeal, this court explained that the ALJ permissibly gave "little weight" to Dr. Tochev's opinions because they were not supported by the evidence of record and contrary to other evidence of record. For instance, the court noted that Dr. Tochev stated on several occasions that McCoy was "self-employed," which, as noted by the ALJ, was inconsistent with his assertion that McCoy was unable to perform even sedentary work. *See McCoy v. Saul*, 2019 WL 6703949, *8 (W.D. Va. Oct. 29, 2019).

extremities were normal without clubbing, cyanosis or edema; his pulmonary examination was normal; he had a normal gait; his cervical, thoracic and lumbar spine was stable without tenderness and normal range of motion; and his motor examination revealed normal tone, bulk and strength.

The ALJ noted he found the previous ALJ's August 2017 decision finding that McCoy was limited to light work with no more than occasional overhead reaching due to mild cervical and shoulder issues "unpersuasive" because the current period at issue did not show shoulder issues or indicate significant cervical symptoms. (R. at 31, 69.) The record shows McCoy complained of shoulder and hand pain on two occasions since his alleged disability date of August 22, 2017. In June 2018, McCoy reported shoulder pain and hand pain to Coe, but she noted no examination findings or diagnosis concerning his shoulders or hands. Again, in April 2019, McCoy complained of right shoulder and bilateral hand pain to Dr. Keene who only noted arthritic changes to McCoy's digits, and she placed no restrictions on his work-related abilities nor made a diagnosis concerning such. Based on this, I find substantial evidence exits to support the ALJ's consideration of the medical evidence.

McCoy also argues that substantial evidence does not exist in the record to support the ALJ's finding that the severity of his cirrhosis, and the *possibility* of its resulting limitations, did not meet or equal the listed impairment for chronic liver disease found at Part 404, Subpart P, Appendix 1, § 5.05. (Plaintiff's Brief at 5.) The ultimate decision of whether or not a claimant meets or equals a listing is reserved to the Commissioner. (R. at 18.) *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2021) (whether a claimant's impairment meets or equals a listed impairment is an issue reserved exclusively to the Commissioner). The ALJ

analyzed McCoy's diagnosis of alcoholic cirrhosis and probable end stage liver disease and found his condition did not meet or equal § 5.05, the listing for chronic liver disease found at Part 404, Subpart P, Appendix 1, § 5.05. (R. at 26.)

> Listing § 5.05 requires, as relevant here:
>
> Chronic liver disease, with:
>
> B.      Ascites or hydrothorax not attributable to other causes, despite continuing treatment as prescribed, present on at least two evaluations at least 60 days apart within a consecutive 6-month period. Each evaluation must be documented by:
>   1.  Paracentesis or thoracentesis; or
>   2.  Appropriate medically acceptable imaging or physical examination and one of the following:
>         a.  Serum albumin of 3.0 g/dL or less; or
>         b.  International Normalized Ratio (INR) of at least 1.5 ….

20 C.F.R. Pt. 404, Subpart P, App. 1, § 5.05.

The ALJ found that, while McCoy had ascites on October 1, 2020, (R. at 739), and albumin of 2.4, (R. at 762), his albumin had improved to 3.1 on October 3, 2020. (R. at 26, 768.) The ALJ noted the record did not show ascites with albumin below 3.0 at 60 days apart from the October 1, 2020, findings. I agree with this finding. On December 9, 2020, after remaining mostly abstinent from alcohol, McCoy had minimal jaundice; he was not anemic; his lungs were clear to auscultation posteriorly; his breathing was unlabored; his abdomen was soft with mild tenderness in the right upper quadrant; he had no clinical evidence of ascites; his liver was palpable below the right costal margin; his spleen was not palpable; he had normal bowel sounds; he had no pedal edema; he was alert and oriented with no asterixis; he had normal mental status examination; and his skin had no obvious rashes or lesions. His lab results were much improved with improvement

in bilirubin and INR and his MELD score improved to 15. McCoy's lab results showed his creatinine level was 0.9, his bilirubin level was 2.8, his albumin level was 3.3 and his INR was 1.5.

The listing of impairments further provides under § 5.05(G), a claimant with end stage liver disease with SSA CLD scores of 22 or greater calculated as described in 5.00D11 is under a disability from at least the date of the first score. 20 C.F.R. Pt. 404, Subpart P, App. 1, § 5.05(G). Listing § 5.00D11 requires two SSA CLD scores with the laboratory values for the second SSA CLD score calculation to be obtained at least 60 days after the latest laboratory value for the first SSS CLD score and within the required six-month period. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 5.00D11e.

Listing § 5.00D11 is for end stage liver disease documented by scores from the SSA Chronic Liver Disease, ("SSA CLD"), calculation. A formula that includes three laboratory values: serum total bilirubin, serum creatinine and INR is used to calculate the SSA CLD score.[16] *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 5.00D11. In determining McCoy's SSA CLD score, the court utilized the Social Security Administration's Chronic Liver Disease Calculator. *See* https://www.ssa.gov/disability/professionals/bluebook/impairments_digestive_cld. htm (last visited Aug. 17, 2022). While McCoy's lab values showed a SSA CLD score of 22.3 in September 2020, his SSA CLD score for December 2020 was

---

[16] "The Social Security Administration uses the SSA Chronic Liver Disease (SSA CLD) calculation" similar to the MELD calculation. An individual meets the criteria of the listing if he or she has two SSA CLD scores in excess of 22. The Commissioner's Chronic Liver Disease Calculator has been adapted from the MELD formula documented on the UNOS Website." *See Rodriguez v. Astrue*, 2012 WL 844540, at *9 (E.D. Cal. Mar. 12, 2012) (internal quotations and citations omitted); *see also* https://optn.transplant.hrsa.gov/data/allocation-calculators/about-meld-and-peld/ (last visited Aug. 17, 2022).

14.9. These scores did not meet listing § 5.05(G) since both scores are not 22 or greater. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 5.05(G).

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.  Substantial evidence exists in the record to support the ALJ's finding that McCoy did not meet or equal listing § 5.05G;

3.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

4.  Substantial evidence exists in the record to support the Commissioner's finding that McCoy was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McCoy's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioners decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    August 17, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE